## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **FAST FOOD GOURMET, INC.,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No.  05 C 6022 |
| | ) |
| **LITTLE LADY FOODS, INC., and** | ) |
| **KRAFT FOODS GLOBAL, INC.** | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Fast Food Gourmet, Inc.'s ("FFGI") second amended complaint alleges misappropriation of trade secrets against Little Lady Foods, Inc. ("LLFI") and Kraft Foods Global, Inc. ("Kraft")(Counts I and II, respectively), breach of contract against LLFI (Count III), and unjust enrichment against Kraft (Count IV).  Before me are: defendants' motions for summary judgment; defendants' motion to strike portions of FFGI's consolidated statement of additional facts and responses to defendants' Local Rule 56.1 statements; defendants' motion for leave to incorporate motion to bar into pending motion to strike; and plaintiff's motion to strike defendants' replies and additional facts in support of their Local Rule 56.1 statements.  For the following reasons, defendants' motion for leave to incorporate motion to bar into pending motion to strike is granted, and defendants' motion to bar is granted in part; defendants' motion to strike is otherwise denied. Plaintiff's motion to strike is denied.  LLFI's motion for summary

judgment is denied; and Kraft's motion for summary judgment is denied.

I.

Defendants have moved for leave to incorporate their motion to bar into their pending motion to strike. That motion is granted. The motion to bar is granted in part, as explained below.

During discovery, FFGI provided a document entitled Plaintiff's Identification of Trade Secrets (the "Identification") stating that FFGI's trade secrets that it contends were misappropriated by the defendants consisted of "a method for preparing thin-crust frozen pizzas that resulted in an artisan-style crust of a quality not otherwise achievable in the world of frozen pizzas, a crust that is crispy on the bottom, while soft and tender inside." (Defs. Mot. to Bar, Ex. A.) The Identification continues that the "core components that allowed FFGI to achieve this result came from a combination of the following:" (A) stress-free sheeting and pre-sheeting; (B) thin dough sheeting; (C) exceptionally high banking temperature; and (D) the stone-hearth oven. (*Id.*) The Identification further explains that the FFGI pizza: "utilized a Rheon stress-free dough sheeting system[;]" "was sheeted to a thickness that would permit the final product . . . to have an outer edge thickness of approximately 7 to 8 millimeters[;]" "was baked at a temperature exceeding 600 degrees Fahrenheit[;]" and "was baked on a conveyorized stone-hearth oven

utilizing top and bottom heating introduced with impingement."

On December 12, 2006, Kenneth Crouse ("Crouse"), FFGI's vice president of operations – the person who verified the Identification – was deposed as a FED. R. CIV. P. 30(b)(6) witness. Crouse initially testified that, at the time he executed the Identification and as of the date of his deposition, it was an accurate and complete description of the trade secrets and there were no other trade secrets that FFGI contends defendants misappropriated. Crouse also testified that the Identification was not necessarily complete. When asked to list every process, technique, or anything else missing from the Identification, Crouse identified: (1) floor time of 90 minutes; (2) dough temperature of approximately 68 to 72 degrees Fahrenheit when removed from the mixer; (3) introduction of ice into the dough to achieve cold dough; and (4) removal of all dough conditioners. Crouse explained that he would call these "factors relating to (A) stress-free sheeting and pre-sheeting [as set forth in the Identification]." Crouse testified that he "would not say they are our trade secrets." When defendants' counsel asked Crouse if it was accurate that he was not claiming the floor time, temperature, introduction of ice, and removal of dough as trade secrets, Crouse explained that he "feel[s] these things are relative to and important to part A [of the Identification] which is what we are discussing: Stress-free and pre-sheeting, and in the process you are demanding . . .

a yes or no pursuant to is it a trade secret or is it not a trade secret. . . . " Defendants' counsel then asked, "My question to you is simply this: Are these things that we just discussed: Floor time, the actual amount of floor time being 90 minutes, the temperature of the dough, the introduction of ice, and the removal of dough conditioners, are you claiming that those factors are . . . FFGI's trade secrets?" Crouse answered, "No."

On February 2, 2007, shortly before the close of fact discovery, FFGI was granted leave to amend its complaint. The motion for leave to file the second amended complaint stated that the only purpose for the amendment was to "add[] the specific allegation that LLFI breached its contractual obligations not to manufacture pizzas that were, in the aggregate, substantially identical to the FFGI pizzas." The motion for leave to file the second amended complaint acknowledged that this allegation overlaps with the existing trade secret allegations, but clarified "that this alleged contractual violation gives rise to a claim for breach independent of the existence of trade secrets." The motion for leave to file the second amended complaint also identified two paragraphs in which the phrase "crust-making methodology" was substituted for "trade secrets."

Kraft propounded interrogatories concerning the second amended complaint, in which it asked FFGI to identify (1) the aspects of its crust-making methodology, as used in the second amended

complaint, as well as those aspects that it contends were used by LLFI in connection with manufacturing pizzas for Kraft, and (2) the components of its crust-making methodology that it contends are Proprietary Information as defined in the Private Label Production Agreement (the "Agreement") between FFGI and LLFI.  In its April 27, 2007 answers to Kraft's interrogatories, FFGI stated that the crust-making methodology it alleges was used in connection with Kraft's products includes the following items:

> (a) utilization of ice in the dough formula;
> (b) targeting a post-mixture temperature specification of 68-72 degrees Fahrenheit; (c) ambient floor time of 90-120 minutes; (d) placing portions of dough into covered, oiled tubs or troughs; (e) elimination of artificial dough conditioners; (f) oven temperature of approximately 750 degrees Fahrenheit; (g) crust density (2 to 2.3 g/sq. in.); (h) use of stress-free (low stress) sheeting equipment; (i) utilization of stone hearth conveyor impingement oven; (j) water absorption bakers percentage of 58-62 percent.

(See Defs. Mot. to Bar, Ex. D.)  FFGI further stated that these aspects of the crust-making methodology were Proprietary Information. (*See id.*)  Based on FFGI's interrogatory answers, defendants argue that FFGI is trying to expand its trade secrets by adding six components to the four components previously set forth in the Identification.

Defendants moved to bar any evidence in support of FFGI's trade secrets claims pertaining to the six additional components pursuant to FED. R. CIV. P. 37(c)(1) because FFGI did not amend the

Identification as required by FED. R. CIV. P. 26(e)(2). Specifically, defendants sought to bar evidence concerning the following items identified in FFGI's interrogatory answers: (a) use of ice in the dough mixture; (b) targeting a post-mixture temperature of 68-72 degrees; (c) ambient floor time of 90-120 minutes; (d) placing fifteen pound dough portions in oiled plastic tubs; (e) not using artificial dough conditioners; and (j) targeting water absorption bakers percentage of 58-62 percent. (*See* Defs. Mot. to Bar at 7-8.) Defendants did not seek to bar evidence regarding the remaining four items identified in FFGI's interrogatory answers, namely: (f) oven temperature of approximately 750 degrees Fahrenheit;[1] (g) crust density (2 to 2.3 g/sq. in.);[2] (h) use of stress-free (low stress) sheeting equipment;[3] and (i) utilization of stone hearth conveyor impingement oven. (*See id.*) The motion to bar was originally referred to Judge Cole. He ruled, but later vacated his order. Judge Aspen, to whom an objection had been made, also vacated his

---

[1]Defendants did not raise this point in the motion to bar, but, unlike the interrogatory answers, the Identification merely specifies a baking temperature "exceeding 600 degrees Fahrenheit."

[2]Defendants did not raise this point in the motion to bar, but, unlike the interrogatory answers, the Identification does not refer to crust density or provide any specific measurement thereof; rather, the Identification mentions only "thickness," specifically "outer edge thickness of approximately 7 to 8 millimeters."

[3]Defendants did not raise this point in the motion to bar, but unlike the interrogatory answers, the Identification lists only stress-free sheeting equipment – not low stress sheeting equipment.

ruling on the objection.  I therefore consider the motion *de novo*.

Defendants argue that FFGI failed to seasonably supplement the Identification, relying on FED. R. CIV. P. 26(e), which states

> A party who has . . . responded to a request for discovery with a disclosure or response is under a duty to supplement or correct the disclosure or response to include information thereafter acquired if ordered by the court or in the following circumstances: . . . (2) A party is under a duty seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

FED. R. CIV. P. 26(e)(2).  Defendants assert that, under FED. R. CIV. P. 37(c)(1), FFGI should not be permitted to present evidence related to additional information provided in its April 27 interrogatory answers.  FED. R. CIV. P. 37(c)(1) provides that a party that "without substantial justification fails . . . to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any . . . information not so disclosed . . . . "  Defendants seek to bar FFGI from presenting evidence regarding the following items identified in its April 27 interrogatory answers: (a) use of ice in the dough mixture; (b) targeting a post-mixture temperature of 68-72 degrees; (c) ambient floor time of 90-120 minutes; (d) placing fifteen pound dough

portions in oiled plastic tubs; (e) not using artificial dough conditioners; and (j) targeting water absorption bakers percentage of 58-62 percent. (*See* Defs. Mot. to Bar at 7-8.) Defendants do not seek to bar evidence regarding the remaining four items listed in FFGI's interrogatory answers, namely: (f) oven temperature of approximately 750 degrees Fahrenheit; (g) crust density (2 to 2.3 g/sq. in.); (h) use of stress-free (low stress) sheeting equipment; and (i) utilization of stone hearth conveyor impingement oven. (*See id.*)

First, Crouse testified about items (a), (b), (c), and (e) in his deposition. Thus, this information was sufficiently "otherwise made known" to defendants during discovery. Defendants contend that this information should be barred because Crouse specifically testified that these four items were not FFGI's trade secrets. That is correct as far as a specific answer to a specific question, but mischaracterizes Crouse's testimony regarding these factors. It is unmistakable from other portions of Crouse's testimony that he indicated the Identification was incomplete, explained the additional information necessary to complete it, and stated that such additional information was "relative" and "important" to the stress-free sheeting and pre-sheeting component of FFGI's trade secrets listed in the Identification.

Second, items (d) and (j) were not covered in Crouse's deposition. FFGI attached a document to its response brief that it

claims "contains virtually all" of the aspects identified in its April 27 interrogatory answers. (*See* Pl. Opp'n to Defs. Mot. to Bar at 11, Ex. 5.) This document was identified in response to LLFI's interrogatories in April 2006 in answering an interrogatory asking FFGI to "[i]dentify each and every 'specification' as referenced in Paragraph 3 of the Amended Complaint that FFGI contends is a trade secret." (*See id.*; Defs. Mot. to Bar, Ex. H.) With regard to item (d), this document does not mention placing portions of the dough into covered, oiled tubs or troughs. FFGI has not identified any means by which item (d) was otherwise disclosed to defendants during discovery. With regard to item (j), on one page of this document, FFGI appears to argue that it was referenced as "62.7% TOTAL MOISTURE ABSORPTION." (*See* Pl. Opp'n to Defs. Mot. to Bar at 11, Ex. 5.) Item (j) of FFGI's crust-making methodology states "water absorption bakers percentage of 58-62 percent." It is not clear that the document discloses the information contained in item (j), particularly as the percentage contained in the document is actually higher than the range stated in the interrogatory answers. Unlike the information clearly set forth in Crouse's deposition testimony, the information contained in the document is not sufficient to have otherwise disclosed to defendants the information set forth in item (j). Therefore, FFGI is barred from presenting evidence related to items (d) and (j).

Accordingly, in addition to evidence regarding the information

set forth in the Identification, FFGI may present evidence related to: utilization of ice in the dough formula; targeting a post-mixture temperature specification of 68-72 degrees Fahrenheit; ambient floor time of 90-120 minutes; and elimination of artificial dough conditioners.  FFGI may also present evidence regarding oven temperature of approximately 750 degrees Fahrenheit, crust density (2 to 2.3 g/sq. in.), use of stress-free (low stress) sheeting equipment, and utilization of stone hearth conveyor impingement oven as set forth its interrogatory answers – even to the extent the information relating to temperature, crust density, and sheeting differ from its initial Identification – because defendants did not seek to bar such evidence.  FFGI may not present evidence related to:  placing portions of dough into covered, oiled tubs or troughs; and water absorption bakers percentage of 58-62 percent.

## II.

Summary judgment is appropriate where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant initially bears the burden of "identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the non-movant "may not rest upon the mere allegations or denials of the adverse party's pleading," but rather "must set forth specific facts showing that there is a genuine issue for trial." *See* FED. R. CIV. P. 56(e). I must construe all facts in the light most favorable to the non-movant and draw all justifiable inferences in favor of that party. *See Anderson*, 477 U.S. at 255.

Along with the summary judgment briefs, the parties have filed motions to strike relating to the opposing parties' Local Rule 56.1 statements. Specifically, plaintiff moves to strike defendants' replies and additional facts in support of their Local Rule 56.1 statements as not permitted under the local rules. Defendants move to strike certain portions of plaintiff's consolidated statement of additional facts that (1) do not allege short specific facts, (2) constitute legal argument, and (3) contain undisclosed expert opinion testimony. Defendants also move to strike certain portions of plaintiff's responses to defendants' Local Rule 56.1 statements that (1) neither admit nor deny the alleged fact, (2) do not cite to evidence to support denials, and (3) consist of improper legal argument. While I deny these motions, I will not consider any objected to aspect of any party's statement of facts, response

thereto, or reply in support thereof, that does not comport with the local rules.  Accordingly, the facts set forth below are taken from the properly pled portions of the parties' Local Rule 56.1 statements and accompanying exhibits.

FFGI, a Missouri corporation with its principal place of business in Kansas, develops and produces frozen pizzas.  LLFI, an Illinois corporation with its principal place of business in Elk Grove Village, Illinois, is the largest contract manufacturer of frozen pizza in the United States.  Kraft is a Delaware corporation with its principal place of business in Illinois.  Kraft markets and sells the DiGiorno Thin Crispy Crust frozen pizza.

During the 1990s, FFGI wanted to create a non-traditional "tart flambee" type of pizza with gourmet toppings, and Crouse traveled to Europe to investigate pizzas.  FFGI eventually arrived at a combination of techniques to mass produce its frozen thin-crust pizza, Stillwell's Stone Fired Pizza.  FFGI claims that these techniques include:  stress-free (low stress) sheeting and pre-sheeting,[4] a Gouet conveyorized, impingement stone-hearth oven,[5]

---

[4]John Geocaris ("Geocaris"), President and Chief Executive Officer of LLFI, stated in his declaration that LLFI was aware of Rheon sheeting products before it began its co-packing relationship with FFGI.  FFGI claims that it encouraged LLFI to purchase a Rheon brand pre-sheeter, but FFGI's pizza was initially produced using a Rondo brand pre-sheeter, which is not entirely stress-free; although FFGI's expert, Dr. R Carl Hoseney ("Hoseney"), testified that, even using such a pre-sheeter, if the dough were then allowed to relax for several minutes before going through the stress-free sheeter, it would "[l]ikely" allow the dough to be stress-free.  A Rheon brand pre-sheeter was obtained in the fall of 2003 for

thin dough sheeting, crust density of 2-2.3 g/sq. in., baking temperature exceeding 600 - approximately 750 - degrees Fahrenheit, cool dough temperature of 68-72 degrees Fahrenheit, the use of ice in the dough, floor time of 90-120 minutes, and the elimination of dough conditioners.

In October 1998, FFGI chose Custom Foods, Inc. ("Custom Foods") to act as its co-packer. FFGI initially sold its product primarily in the Kansas area. By spring 2002, it had attracted the interest of Whole Foods and Wild Oats. And, by the following year, FFGI's product appeared in Costco.

On November 30, 2001, the *Kansas City Business Journal* published an interview with Crouse. In this interview, Crouse revealed FFGI's use of: "stress-free" sheeting; baking temperature of 750 degrees for one minute; a blast freezer; and a stone-hearth oven from Europe. In addition, FFGI's 2001 marketing materials referred to its sixty-second cooking time at "over 750 degrees F"

---

production of Kraft's pizza.

[5]FFGI claims that this type of oven is uncommon for the commercial manufacture of frozen pizza, and Hoseney had never heard of anyone using a stone impingement oven to manufacture frozen pizzas. Defendants do not dispute that one witness, John W. Parr II ("Parr"), who they identified who used a stone-hearth oven to manufacture thin-crust pizzas in Europe did so using conventional baking temperatures of 325 to 400 degrees Fahrenheit. Parr testified that, in a letter, he told Crouse that there were manufacturers in Europe using Gouet turbo-jet ovens to manufacture pizza. FFGI admits "that the oven was commercially available and that FFGI put it to a use that was consistent with its range of intended purposes." FFGI also admits that Gouet's European operations' marketing materials included a picture of a pizza.

and its flash freezing techniques.  In his declaration, Crouse now claims that the baking time and temperatures in both the article and the marketing materials "do not reflect the actual specifications in use on the FFGI pizza as manufactured at [LLFI]."

_____In a letter dated May 2, 2002, Custom Foods terminated its manufacturing agreement with FFGI due to FFGI's failure to pay rent.  On August 23, 2002, FFGI and LLFI entered into the Agreement.  The Agreement restricts LLFI's use of FFGI's "Proprietary Information," which is defined in Section 7(a) as:

> all information, materials and data, whether communicated orally, in writing or in any other format, which is (a) sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use, and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

The Agreement also lists "[b]y way of illustration, but not limitation," various types of information included in the definition of Proprietary Information.  The Agreement requires the parties to identify "[t]o the extent practicable," all information entitled to protection "by appropriate markings on any documents exchanged, or, if the disclosure has been orally, then the disclosing Party shall identify the information as 'confidential' at the time the disclosure is made and, within two (2) weeks of the disclosure, shall confirm in writing the confidential nature of the oral communication."

In his declaration, Crouse states that he "emphasized repeatedly to [LLFI] personnel . . . that FFGI's equipment, which enabled [FFGI] to make [its] unique crust, was highly confidential information that needed to be kept in confidence." Crouse further declares that he "provided [LLFI] with a listing of [FFGI's] equipment, specifications and layout, and designated that listing as confidential." Crouse testified that he does not recall ever sending a writing confirming that a conversation he had with someone at LLFI was confidential. LLFI's Senior Vice President of Sales and Marketing, Peter Cokinos ("Cokinos"), claims in his declaration that FFGI never orally informed him or anyone else at LLFI that FFGI's equipment constituted Proprietary Information. Cokinos further declares that FFGI never provided LLFI with a written list identifying its equipment line (or component parts thereof) as Proprietary Information or other confidential information.

In addition to agreeing to protect Proprietary Information, LLFI agreed not to "produce pizzas with specifications which are identical or, in the aggregate, substantially identical to the existing specifications of the FFGI pizzas for any supplier or brand other than FFGI . . . . " The Agreement further provides that LLFI is not prohibited "from marketing to potential customers the stone firing process or utilizing the FFGI Equipped Line for other customers (subject otherwise to the restrictions in this

15

Section)."  Moreover, Cokinos testified that the Agreement provided for reduced pricing to FFGI based upon more frequent use of the equipment line, whether by FFGI or another customer.

FFGI's equipment was moved to LLFI's "Primero" facility in Elk Grove Village, and, in August 2002, LLFI began producing FFGI's pizza.  As originally set up at LLFI, this equipment line included the Gouet conveyorized, impingement stone-hearth oven, a Rondo brand pre-sheeter, and a Rheon stress-free sheeter.  Prior to its relationship with FFGI, LLFI had never manufactured any stone-fired products[6] and never owned or leased a stone hearth conveyor oven of any type.  During its relationship with FFGI, in late summer or early fall 2003, LLFI contacted manufacturers seeking proposals for a stone deck impingement oven, and eventually obtained a custom-made stone deck impinging oven for its Gurnee facility.[7]

_____

[6]LLFI does not dispute that, prior to its work with FFGI, it never utilized a stone hearth conveyor oven to manufacture frozen pizza crusts.  Although LLFI never used a stone-hearth conveyor oven to manufacture frozen pizzas, Geocaris stated in his declaration that LLFI was aware of the commercial availability of stone-hearth conveyor ovens prior to its relationship with FFGI, as he had seen the Gouet Turbo-Jet oven at trade shows and advertised in trade journals.

[7]Dennis Dolski ("Dolski") of A&K Automation testified that the stone deck impinging oven for LLFI was "the first one we built." He testified that he examined the space to determine how big an oven to build, and he examined LLFI's existing stone hearth oven. Dolski testified that the oven built for LLFI was not just a bigger version of LLFI's existing oven, but rather was based on his company's oven design changed to accommodate the heavier brick.

Starting in July 2002, FFGI sought the help of Thomas Lehmann ("Lehmann") of the American Baking Institute, an expert in the wholesale production of pizza known as "the Dough Doctor," to improve product quality. Lehmann issued reports dated July 23, 2002, July 25, 2002, December 16, 2002, and April 11, 2003, which contain various recommendations for improving FFGI's product quality at LLFI's facility. According to Crouse's declaration, it took until the latter half of 2003 for LLFI to produce a product consistently according to FFGI's specifications and to achieve a consistently acceptable result.

In March 2003, Julie Branch ("Branch"), a Group Leader with Kraft's Convenient Meals Global Packaging Group, was advised that Kraft's marketing department wanted to develop a premium thin crust pizza with a crispy bottom and soft interior. The project was referred to internally as "Project Twiggy." Kraft assigned Branch to work on developing a crust for Project Twiggy. From March 2003 through June 2003, Branch and her team evaluated and sampled more than 60 permutations for a possible crust, which "featured different variations of dough formulas, dough thicknesses, proofing times, floor times, sheeting, [p]rocessing and par-baking techniques, and cooking times." This testing resulted in a crust that Kraft's marketing department deemed acceptable, which was prepared using a "hot press" method for the dough (as opposed to sheeting equipment).

In August 2003, Kraft selected LLFI as the co-packer for Project Twiggy.[8] Metzger testified that his understanding of how the decision was made to use LLFI, as opposed to Nations, "was just the preferred crust texture, as [he] recall[s]." Metzger also testified that, "It was made clear to [him by someone at Kraft] that the stone oven was the preferred method of producing the crust." According to Branch's declaration, the equipment at LLFI differed from Kraft's pilot plant. LLFI produced Kraft's pizza on the same equipment line as FFGI,[9] which used a sheeting line - rather than a hot press - and conveyer oven. Branch testified that she believed the oven at the pilot plant was an impingement oven with a metal mesh belting surface. Kraft does not dispute that, prior to making the DiGiorno Thin Crispy Crust

---

[8]Branch testified that she was not involved in the process of selecting a manufacturing location. But, when asked if Branch participated in the decision to select LLFI as the co-manufacturer for Project Twiggy, Jack Metzger ("Metzger"), Kraft's Manager of External Manufacturing (also known as co-manufacturing), testified that he thought that is "a fair statement."

[9]The parties agree that FFGI's equipment line was not being used to capacity, but they disagree as to whether LLFI or Kraft chose to use the FFGI line. FFGI points to Branch's deposition, in which her answer to the question, "Ultimately you decided not to go with the gas oven but to go with the brick oven; correct?" was, "Yes." In Cokinos' declaration, however, he states:

> Because the FFGI equipment line was idle a majority of time, [LLFI] proposed that Kraft utilize the line . . . . The Kraft pizza, however, could have been manufactured on other of [LLFI's] lines. [LLFI] allowed Kraft to work on the line that contained FFGI's equipment because, due to FFGI's low production numbers, that line had little use.

pizza, it never utilized a stone hearth conveyor oven to manufacture frozen pizza crusts. Branch's declaration also states that the ambient environment at LLFI differed from the Kraft pilot plant, where temperature and humidity conditions were relatively stable; the ambient environment at LLFI, however, was subject to fluctuation.

Branch declares that, as a result of the different equipment and environment at LLFI, she and her team modified the dough formula and process that was developed at Kraft's pilot plant. From August 18, 2003 through October 2003, Kraft ran numerous test batches at LLFI varying the dough formula, the ambient floor time, the equipment, the amount of starch, enzymes, salt, and water/ice added to the dough, the use of oil and cornmeal, the dough temperature, and the dough weight/thickness. Kraft does not dispute that SALP (sodium aluminum phosphate), baking soda, and Fermaid P, were removed from the formula, and the extremely hot conveyorized stone oven was used in place of the more conventional baking temperatures on a wire mesh belt.[10] Kraft also does not dispute that ice was used to achieve a cool dough temperature, and lengthy - 90 minutes - floor time was provided before sheeting and baking. During testing on September 24, 2003, Branch observed

_____

[10]Branch testified that the test batches on August 18, 2003 were the first time pizza for Project Twiggy was baked in a brick oven, and, prior to that, she had never cooked a crust at 600 degrees.

19

that using the Rondo brand pre-sheeter produced inconsistent dough pieces.  A Rheon brand V4 pre-sheeter was added to the line.

Kraft Pizza Company, a division of Kraft Foods North America, Inc. ("KFNA"), and LLFI entered into a Project Agreement for Master External Manufacturing Agreement (the "Kraft Agreement") effective January 1, 2004, which was signed on "3/18/05" and "3/11/04" by KFNA and LLFI, respectively.  The Kraft Agreement states that it "is executed and delivered in accordance with the Master External Manufacturing Agreement dated December 1, 2003, (the "Master Agreement") between KFNA and [LLFI], and this Agreement becomes part of the Master Agreement as of the effective date hereof."  Pursuant to the Kraft Agreement, KFNA is required to pay LLFI "for the services performed and the Product purchased pursuant to this Agreement."

The parties dispute the extent of LLFI's involvement in Kraft's development process.  Kraft claims that Branch recommended that LLFI replace the Rondo brand pre-sheeter with a Rheon brand dough extruder.  But FFGI contends the sheeting equipment used by Kraft was recommended by LLFI, relying on the following portion of Metzger's testimony:

> Q: Did anybody at any time communicate to you the significance of stress-free or low stress dough handling?
> A: To the best of my recollection, whatever sheeting line was used was the recommendation of [LLFI].

Kraft further claims that it developed its crust formula without

any assistance or input from LLFI. Metzger testified, however, that he recalls both Kraft and LLFI personnel providing input regarding equipment settings. FFGI contends that Project Twiggy was "co-developed" with LLFI, relying on a document entitled "Twiggy and Percy Commercialization Review" dated November 20, 2004, which states "[LLFI] has co-developed this product with Kraft (Kraft owned) and will produce at Elk Grove (regional launch) utilizing current assets and Gurnee (national launch) utilizing newly purchased capital assets with commitment from Kraft." FFGI's further evidence of co-development includes Branch's apparent lack of knowledge that the oven temperature was measured in degrees Centigrade, not Fahrenheit, and a handwritten document authored by Branch in August 2003 in which she refers to the "Co-dev agreement" and "'our formula [and] process' on their equipment."[11]

FFGI has provided evidence that the FFGI and Kraft products are similar. In his March 2007 report, Hoseney opined that Kraft's initial pizza crust developed in its pilot plant had "essentially no similarity" to the crusts ultimately produced at LLFI, but that the crusts produced at LLFI were "very similar to the crust produced for [FFGI]." In addition, in his deposition,

---

[11]Branch testified that "'our formula [and] process' on their equipment" meant that she "was taking our process and formulation from the pilot plant and working with [LLFI] to manufacture it on their equipment." She testified that she has "no idea" why she put "our formula [and] process" in quotation marks.

Hoseney agreed "that the formulas and procedures for the Kraft pizza are very similar to the formulas and procedures for the [FFGI] pizza." When asked if it was appropriate to say that the Kraft and FFGI "formulas are different but functionally equivalent[,]" Hoseney answered, "I think so." Hoseney further testified that functionally equivalent "means the ability to produce a crust with dual texture." Hoseney further testified that it is "[n]ot so easy" to produce a dual texture crust.[12] Also, Martin Rasmussen ("Rasmussen"), formerly the Manager of Manufacturing Services for Schwan Food Company (the second largest seller of frozen pizza behind Kraft), testified that he sampled both crusts and he thought that they were "very, very similar . . . you'd have to have a crust expert to really evaluate them, but in [his] opinion, they were very, very similar." Rasmussen testified that he compared different pizzas every day as part of his responsibilities for Schwan's. He also testified that he is qualified to make an assessment from a pizza manufacturer's perspective, but not from a dough expert's perspective because he is not a dough expert.

Defendants have provided evidence that the FFGI and Kraft products are different. Lehmann testified that he does not "see

---

[12]Hoseney testified that "not only the simple formulation but the process, the controlling of the temperature, the – particularly the baking in the stone-fired oven, if you want to call it that, the proof time. All of these factors come together to produce this."

any real similarities[,]" the formulas and sizes "are entirely different[,]" and the specifications "are not substantially identical." In response to Lehmann's testimony, Crouse's declaration states that the specifications reflected in the documents Lehmann examined were substantially different from the specifications actually used for the FFGI product at LLFI. In addition, in his May 2007 report, defendants' expert, Dr. Jon Faubion ("Faubion"), a professor of Grain Science at Kansas State University, opines that the FFGI and Kraft pizzas "are neither identical nor substantially similar in the aggregate." Faubion's report indicates that both products are rectangular and thin, but there are "few if any further similarities." Moreover, Faubion's report concludes that, "Not only are the pizzas themselves not identical, but the crust formulations are not identical."

Beyond product similarity, Faubion's report also claims that FFGI's production techniques are not secret. Faubion's report states that high oven temperature, stone hearth oven, stress free sheeting, and thin sheeting "either individually or in combination, are well known in the commercial pizza industry."[13]

---

[13]Addressing each component separately, Faubion states that: "the use of oven temperatures in excess of 700 degrees is well known in the commercial pizza industry[;]" the "use of a stone hearth oven is well known[;]" "the use of 'stress free' sheeting as identified by FFGI is generally known in the commercial pizza industry[;]" and "the selection of an unstated target dough sheet thickness to 'permit' (author's emphasis) a final crust edge thickness of 'approximately 7-8 mm' is not a trade secret."

The report also states that targeting post-mixing dough temperature of 68-72 degrees Fahrenheit, the use of ice in dough formulation, ambient floor time of 90-120 minutes, and elimination of artificial dough conditioners "are generally known in the commercial industry, individually and/or in combination."[14] In response, FFGI notes that Faubion's report fails to "suggest that anybody else in the industry is utilizing the combination of techniques identified by FFGI in conjunction with a stone-hearth oven of any kind, much less a conveyorized impingement stone-hearth oven." Additionally, Hoseney testified as follows:

> Q: Is there anything about the process that you have listed here for the Fast Food Gourmet process that is unique?
> A: Unique in what respect?
> Q: In the use of a process to create a thin crust pizza on a sheeting line?
> A: Well, I would argue that the whole process is unique . . . .

---

[14]Addressing each aspect separately, Faubion states that "targeting a dough temperature out of the mixer of 68-72°F in the production of sheeted products such as commercial pizza crusts is well known in the commercial pizza industry[,]" and "[t]he use of ice in a dough formulation is simply one means to achieve the target temperature goals[;]" "[a]llowing any mixed dough time at bakery ambient temperature in order to cause it to be more suitable for subsequent processes (dividing, sheeting) is so common & widely known that the phrase describing it, 'floor time' is a term of art[,]" and "[i]n the case of sheeted pizza crusts, it is well known, has been taught publicly and recommended privately, by the author and others, that the best amount of floor time (the amount that produces the best result) is in the general range of ~90-~120 minutes[;]" "eliminating artificial dough conditioners is well known in the commercial pizza industry[;]" and he "can find no reference in the documents provided to [him] for review that FFGI identified 2-2.3 g/in$^2$ as a factor to be measured in its crusts . . . . "

Hoseney also testified that he has worked as a consultant on pizza projects for Kraft, Schwan's, Papa John's, Pizza Hut, Nestle, Pillsbury, and possibly others; and, prior to working on this case beginning sometime in the spring or summer of 2006, he had not heard of anyone using a stone impingement oven to manufacture frozen pizzas. Likewise, Parr, who has "worked in the pizza-manufacturing and/or baking machinery business industry since approximately 1968[,]" stated in his declaration that, throughout his career, FFGI is "the only company [he] ever became aware of using a combination of stress-free sheeting and extremely high (above 600°F) baking temperature in a thinly sheeted pizza crust."

Crouse declares that, by early 2004, he became suspicious that LLFI was using FFGI's equipment to produce a similar pizza. In around March 2004, FFGI's President, David Heggestad ("Heggestad"), telephoned Kraft. FFGI claims that Heggestad informed Kraft's in-house counsel, Jane Leary ("Leary"), that Kraft's pizza had been developed by LLFI on FFGI's production line, in violation of LLFI's contract with FFGI, and the Kraft product was a "rip-off" of FFGI's product that utilized crust-making techniques that LLFI had been bound to maintain in confidence. Kraft disputes the substance of Heggestad's and Leary's conversation. Leary testified that Heggestad indicated he was trying to sell the business because he was very ill, and he did not say anything indicating that LLFI acted wrongly in

providing certain pizza-making techniques to Kraft or regarding
trade secrets.  After the conversation with Heggestad, however,
Leary contacted Metzger, who in turn contacted Cokinos.  Metzger
testified that he would characterize what Cokinos told him as
indicating that FFGI was "not something that Kraft needed to be
concerned about[.]"

In April 2004, FFGI ceased producing its pizza.  Kraft's
pizza - including toppings such as four cheese and grilled
chicken, tomato and spinach - launched nationally in time to reach
stores by May 2004.  In August 2004, FFGI filed for bankruptcy.
By November 2004, revenues from Kraft's pizza exceeded
$100,000,000.00, which was more than double what Kraft had
expected.

## A.  Counts I and II

In Count I of FFGI's second amended complaint, FFGI alleges
that LLFI violated the Illinois Trade Secrets Act (the "ITSA"),
765 ILL. COMP. STAT. 1065/1, *et seq.*, by "misappropriat[ing] FFGI's
trade secrets for its own benefit and for the benefit of Kraft."
Specifically, FFGI alleges that LLFI "made pizzas or pizza crusts
for its own benefit and for the benefit of Kraft using FFGI's
equipment line and other trade secrets."  In Count II, FFGI
alleges that "Kraft knew or had reason to know that [LLFI]
acquired FFGI's trade secrets by improper means, or knew or had
reason to know that [LLFI's] knowledge, use and disclosure of

FFGI's trade secrets was improper . . . . "

Defendants move for summary judgment on the trade secret misappropriation counts, arguing that FFGI's alleged trade secrets are not secret, and that FFGI cannot demonstrate misappropriation by LLFI or Kraft. Specifically, defendants argue that FFGI's alleged trade secrets are not secret because: (1) Rheon stress-free sheeting is widely used; (2) using brick ovens to bake pizza is not unique; (3) the combination of stress-free sheeting and conveyorized oven is not unique; (4) FFGI's president admits LLFI can use a brick or stone oven, Rheon stress-free sheeting, and a combination of the two; (5) FFGI previously disclosed its alleged trade secrets; and (6) FFGI failed to designate its equipment as confidential, as required by the Agreement. (LLFI Mem. in Supp. of Mot. for Summ. J. at 8-17; Kraft Mem. in Supp. of Mot. for Summ. J. at 8-16.) LLFI argues FFGI cannot demonstrate misappropriation because the Agreement allowed LLFI to use FFGI's equipment. (LLFI Mem. in Supp. of Mot. for Summ. J. at 17-19.) And Kraft argues FFGI cannot demonstrate misappropriation because the Agreement allowed LLFI to use FFGI's equipment, Kraft did not know or have reason to know of LLFI's alleged misappropriation, and Kraft independently developed its pizza. (Kraft Mem. in Supp. of Mot. for Summ. J. at 16-20.)

To succeed on a claim for misappropriation of trade secrets under the ITSA, a plaintiff must demonstrate that the information

was: (1) a trade secret; (2) misappropriated; and (3) used in the defendant's business. *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003). The ITSA defines a "trade secret" as information that "(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILL. COMP. STAT. 1065/2(d).

The first requirement - that the information be sufficiently secret - "precludes trade secret protection for information generally known or understood within an industry even if not to the public at large." *Learning Curve*, 342 F.3d at 722 (internal quotation omitted). The second requirement - that the information be subject to reasonable efforts to keep it secret - "prevents a plaintiff who takes no affirmative measures to prevent others from using its proprietary information from obtaining trade secret protection." *Id.* (citation omitted). In addition, Illinois courts refer to six Restatement factors as "instructive guidelines for ascertaining whether a trade secret exists under the Act," but not as "a list of requisite elements." *Id.* These factors include:

(1) the extent to which the information is known outside of the plaintiff's business; (2) the extent to which the information is known by employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the

plaintiff's business and to its competitors; (5) the amount of time, effort, and money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (citations omitted). "The existence of a trade secret ordinarily is a question of fact." *Id.* at 723.

"A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *3M v. Pribyl*, 259 F.3d 587, 595 (7th Cir. 2001) (addressing claim for misappropriation of trade secrets under Wisconsin Uniform Trade Secrets Act, and citing *Syntex Ophthalmics, Inc. v. Tsuetaki*, 701 F.2d 677, 684 (7th Cir. 1983) (applying Illinois trade secret law)); *RRK Holding Co. v. Sears, Roebuck & Co.*, No. 04 C 3944, 2007 WL 495254, at *3 (N.D. Ill. Feb. 14, 2007) (Coar, J.) (citing *3M*, 259 F.3d at 595, and denying defendant's motion for summary judgment on ITSA trade secret misappropriation count). A combination does not constitute a trade secret unless it transforms the individual features into something that is itself secret, i.e. not generally known or easily duplicated by the industry. *See Computer Care v. Serv. Sys. Enters., Inc.*, 982 F.2d 1063, 1074-75 (7th Cir. 1992).

According to defendants' expert, Faubion, high oven temperature "in excess of 700 degrees", stone hearth oven, stress-

free sheeting, and thin sheeting as well as dough temperature out of the mixer of "68-72°F" (for which using "ice in a dough formulation is simply one means to achieve the target temperature goals"), floor time of 90-120 minutes, and eliminating artificial dough conditioners are generally known in the pizza industry.[15] Specifically, Faubion's report states "all items identified in the Plaintiff's Identification of Trade Secrets are generally known in the commercial pizza industry, either individually and/or in combination[.]"  In addition, Faubion's report indicates that "the items identified as [FFGI's] crust making methodology are generally known in the commercial industry, individually and/or in combination[.]"  FFGI responds by arguing that Faubion's report fails to "suggest that anybody else in the industry is utilizing

---

[15]In responding to defendants' statements of facts, FFGI has pointed out that the evidence presented by defendants does not show that Rheon stress-free sheeting equipment is advertised or marketed for use in manufacturing *frozen* pizzas, that FFGI was aware that Nations was using Rheon stress-free equipment to manufacture *frozen* pizzas, or that stress-free sheeting equipment is widely used to manufacture *frozen* pizzas.  Geocaris stated in his declaration that:

> Rheon "stress-free" products were widely promoted and available for use in connection with baking frozen pizzas. [LLFI] had been aware of these products for at least 10 years before 2002. [He] had personally toured the Rheon research and development facility in Charlotte, North Carolina where Rheon displays its sheeting lines and other equipment.

In addition, Rasmussen testified that he visited plants where he saw manufacturers of frozen pizza products using Rheon stress-free sheeting systems.

30

the combination of techniques identified by FFGI in conjunction with a stone-hearth oven of any kind, much less a conveyorized impingement stone-hearth oven." Moreover, FFGI has presented evidence that: the Gouet conveyorized impingement stone-hearth oven is uncommon for the commercial manufacture of frozen pizza, Hoseney never heard of anyone using a stone impingement oven to manufacture frozen pizzas, the only such oven sold in the United States was the one purchased by FFGI, and FFGI is the only company Parr is aware of using a combination of stress-free sheeting and extremely high baking temperature in a thinly sheeted pizza crust.[16]

"'Simply being the first or only one to use certain information does not in and of itself transform otherwise general knowledge into a trade secret.'" *Computer Care,* 982 F.2d at 1073 (quoting *Service Ctrs. of Chicago, Inc. v. Minogue*, 180 Ill. App. 3d 447, 455, 535 N.E.2d 1132, 1137 (Ill. App. Ct. 1989)); *see Learning Curve*, 342 F.3d at 723. But, here, there is additional evidence that FFGI's process is not generally known in the industry. First, Hoseney testified that he "would argue that the whole process is unique." Also, Kraft changed the process and formula developed in its pilot plant once it began making pizza at

_____

[16]Although the Gouet oven was commercially available, LLFI never previously used such an oven; but LLFI was aware of the commercial availability of stone-hearth conveyor ovens. FFGI admits that its use was consistent with the oven's range of intended purposes.

LLFI on FFGI's equipment line. Prior to entering into a co-manufacturing relationship with LLFI, Kraft developed a pizza crust over a period of approximately four months, which was not prepared using a stone hearth oven, extremely high baking temperatures, or sheeting equipment. After commencing its relationship with LLFI, over the course of several months, Kraft altered its dough formula and process by using ice to achieve cool dough temperature, providing for lengthy floor time before sheeting and baking, and removing SALP, baking soda, and Fermaid P. Moreover, the extent of LLFI's involvement in Kraft's development process is disputed. There is also evidence that Kraft chose to use LLFI as co-manufacturer because of its crust.

Further, there is evidence that FFGI's pizza production technique may satisfy several of the Restatement factors as well. For example, FFGI has presented evidence that it expended a great deal of time and money to develop its pizza production technique;[17] that it took some measures to guard the secrecy of its process;[18]

_____

[17]Crouse's declaration states that he traveled to Europe in 1993, and spent the following years - until the commercial manufacture for retail sale began in 1999 - developing FFGI's product; and that FFGI spent hundreds of thousands of dollars on equipment, including $145,000.00 for the Gouet oven.

[18]Crouse's declaration states that FFGI: obtained non-disclosure agreements from potential employees and investors; removed information identifying the manufacturer from the Gouet oven; obtained a non-disclosure agreement from LLFI before disclosing FFGI's production methodology, including the equipment used; and "routinely" marked documents containing information about formulations, techniques, or equipment as "Confidential" before

and that this information was valuable to its business[19] and to its competitors.[20]  Overall, I cannot conclude on these motions that FFGI's pizza production process does not constitute a trade secret.

FFGI must not only establish that its process qualifies as a trade secret, but FFGI must also demonstrate that defendants misappropriated its trade secret.  The ITSA defines "misappropriation" as:

> (1) acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of a person without express or

---

submitting them to LLFI or others.  Defendants argue that FFGI disclosed its trade secrets in Crouse's 2001 interview with the Kansas City Business Journal and in FFGI's marketing material, but neither of these sources disclosed the entirety of FFGI's claimed trade secret.  Defendants also contend that FFGI allowed Rheon representatives to view the production line without signing confidentiality agreements, and FFGI admits that it allowed Rheon representatives to view the equipment line in operation without obtaining signed confidentiality agreements.  Crouse declared that sometimes he accepted "verbal assurances" and that he received such an assurance from Rheon in 1998 that they had firmly established policies of maintaining customer documents and information as confidential.  Moreover, defendants cite to the deposition testimony of Richard Wall ("Wall"), a Rheon sales representative, who testified that he went to the LLFI facility in the fall of 2002, and when he was walking around the line no one from FFGI or LLFI said that any part of the line or its components was confidential "because it's a Rheon line."

[19]Crouse's declaration states that, by the spring of 2002, the FFGI pizza attracted the interest of Whole Foods and Wild Oats, and, by the following year, appeared in Costco stores.

[20]Kraft's pizza launched nationally in May 2004, and, by November 2004, its revenues were double what Kraft had expected.

> implied consent by another person who: (A)
> used improper means to acquire knowledge of
> the trade secret; or (B) at the time of
> disclosure or use, knew or had reason to know
> that knowledge of the trade secret was: (I)
> derived from or through a person who utilized
> improper means to acquire it; (II) acquired
> under circumstances giving rise to a duty to
> maintain its secrecy or limit its use; or
> (III) derived from or through a person who
> owed a duty to the person seeking relief to
> maintain its secrecy or limit its use.

765 ILL. COMP. STAT. 1065/2(b). Thus, LLFI would be liable for trade secret misappropriation under section 1065/2(b)(2)(B)(II) if it improperly disclosed a trade secret in violation of a duty to maintain secrecy or limit use; and, if LLFI improperly disclosed FFGI's trade secret, then Kraft would be liable for misappropriation under section 1065/2(b)(1)if it "knew or had reason to know that the trade secret was acquired by improper means."

## 1. LLFI

LLFI argues that FFGI has failed to demonstrate any facts showing that it improperly disclosed FFGI's alleged trade secrets. "Illinois law precludes the finding of '[a]ny implied duty of nondisclosure' that 'would directly contradict the express agreement of the parties." *Nilssen v. Motorola, Inc.*, 963 F. Supp. 664, 680 (N.D. Ill. 1997) (internal quotation omitted). "Thus a contract that defines the degree of confidentiality among the parties also serves to establish - and to define - the duty of confidentiality required to underpin an [ITSA] claim." *Id.*

(citation omitted). Furthermore, "an agreement that permits a contracting party to attach a 'confidential' label to a document . . . causes that designation to serve as a necessary (but not as a sufficient) condition of a possible trade secret claim regarding that document." *Id.* at 680 n.17, 681-82 (finding defendant was not under duty to maintain confidentiality of any disclosures not marked as confidential).

In this case, the Agreement between FFGI and LLFI sets forth confidentiality requirements. Therefore, to establish misappropriation under the ITSA, FFGI must show that LLFI breached its duty of confidentiality under the Agreement. In addition, the Agreement not only defines what information is considered "Proprietary Information," but also requires FFGI to specifically identify the information it considers confidential. The Agreement states:

> To the extent practicable, . . . any information exchanged by the Parties and entitled to protection under this Agreement, shall be identified as such by appropriate markings on any documents exchanged, or, if the disclosure has been orally, then the disclosing Party shall identify the information as 'confidential' at the time the disclosure is made and, within two (2) weeks of the disclosure, shall confirm in writing the confidential nature of the oral communication.

Therefore, like the defendants in *Nilssen*, LLFI's duty of confidentiality (and corresponding liability for misappropriation under the ITSA) extends to information that FFGI labeled as

confidential.

LLFI claims that FFGI failed to claim either orally or in writing that its equipment line was confidential. But Crouse claims that he not only "emphasized repeatedly to [LLFI] personnel . . . that FFGI's equipment . . . was highly confidential information that needed to be kept in confidence," but also that he "provided [LLFI] with a listing of [FFGI's] equipment, specifications and layout, and designated that listing as confidential." As a result, the extent to which information was appropriately labeled as "confidential," as required under the Agreement, constitutes a disputed material fact that precludes summary judgment.

LLFI argues that it cannot be liable for misappropriation because the Agreement specifically permits LLFI's use of FFGI's equipment line for other customers, including Kraft, relying on Section 7(b), which states: "The foregoing shall not prohibit [LLFI] from marketing to potential customers the stone firing process or utilizing the FFGI Equipped Line for other customers (subject otherwise to the restrictions in this Section)." While LLFI is correct that this clause appears to permit it to utilize "the stone firing process" and the FFGI line for its other customers, it specifies that this permitted conduct is still "subject otherwise to the restrictions in this Section." Thus, even though LLFI may use these items for other customers, in doing

so, it still may not disclose any information deemed confidential under Section 7(a).

LLFI also argues that, even if it were required to keep all of FFGI's equipment and specifications confidential, it is nevertheless entitled to summary judgment based on undisputed evidence that Kraft independently developed its pizza product without input from LLFI. In response, FFGI has identified portions of the record that raise factual questions regarding the extent of LLFI's involvement in Kraft's development process. For example, Metzger testified that LLFI personnel recommended what sheeting line to use and provided input as to what equipment settings to try. Additionally, FFGI has identified Kraft documents that indicate Kraft's product was "co-developed" with LLFI. As such, LLFI's involvement in Kraft's development process is a disputed material fact that precludes summary judgment. Accordingly, LLFI's motion for summary judgment as to Count I is denied.

## 2. Kraft

Under the ITSA, Kraft may be liable for "misappropriation," if it "kn[ew] or ha[d] reason to know that the trade secret was acquired by improper means." 765 ILL. COMP. STAT. 1065/2(b)(1). "[B]reach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use" qualifies as "improper means." *Id.* at § 2(a). As explained above, because I

cannot determine on these motions whether LLFI's actions qualify as improper means, and Kraft's liability hinges upon the trade secret information being acquired by improper means, I cannot decide Kraft's liability on summary judgment.[21]  Therefore, Kraft's motion for summary judgment as to Count II is denied.

### B.  Count III

In Count III, FFGI alleges that LLFI breached the Agreement by (1) "failing to keep FFGI's trade secrets confidential and by failing to protect the proprietary nature of FFGI's trade secrets[;]" and "producing pizzas with nearly identical crusts for Kraft."   As explained above, LLFI's duty of confidentiality depends on the extent to which FFGI's Proprietary Information was labeled as confidential, which is a disputed issue of fact.  Therefore, I cannot decide on summary judgment whether LLFI breached the Agreement by failing to maintain the confidentiality of FFGI's alleged trade secrets.   As such, LLFI's motion for summary judgment as to the portion of Count III based on failure to keep FFGI's trade secrets confidential is denied.

I can, however, address FFGI's second breach of contract allegation, namely that LLFI breached the Agreement by producing

---

[21]Also, the parties have presented conflicting evidence regarding whether or not Kraft "knew or had reason to know" of LLFI's alleged improper means.  FFGI claims that it gave Kraft notice of its possible trade secret misappropriation in a March 2004 phone conversation between Heggestad and Leary, but the substance of that conversation remains disputed.

pizzas with nearly identical crusts for Kraft.  Section 7(a) of the Agreement states that LLFI "will not produce pizzas with specifications which are identical or, in the aggregate, substantially identical to the existing specifications of the FFGI pizzas for any supplier or brand other than FFGI . . . . "  The parties disagree regarding the meaning of this section.

Section 15(b) of the Agreement provides that, "[w]henever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective under Illinois law . . . . "[22] "The interpretation of an unambiguous contract is a question of law, and therefore a dispute over the terms of an unambiguous contract is suited to disposition on summary judgment." *Utility Audit, Inc. v. Horace Mann Serv. Corp*, 383 F.3d 683, 687 (7th Cir. 2004) (affirming summary judgment for defendant on breach of contract claim).  Under Illinois law, I interpret contract terms "according to their plain meaning unless otherwise defined. Although words should be given their ordinary and accepted meaning, they must also be viewed in context, and the contract must be considered as a whole in order to ascertain the parties' intent." *Id.* (internal citations omitted).  To determine the parties' intent, I look solely at the plain language of the contract where the contract's terms are unambiguous; and I only

_____

[22]The parties implicitly agree that Illinois law applies.  LLFI cited Illinois law regarding contract interpretation, and FFGI has not disputed the application of Illinois law.

consider extrinsic evidence where the language of the contract is ambiguous. *See Much v. Pac. Mut. Life Ins. Co.*, 266 F.3d 637, 643 (7th Cir. 2001) (reversing judgment for plaintiff on breach of contract claim); *LaSalle Nat'l Bank v. Serv. Merch. Co.*, 827 F.2d 74, 78 (7th Cir. 1987) (reversing judgment for defendant in declaratory judgment action to construe lease provisions). If I determine a contract is unambiguous, then I must declare its meaning, which is a conclusion of law. *LaSalle*, 827 F.2d at 78. The meaning of an ambiguous contract is a question of fact. *Id.*

The parties first dispute the meaning of the term "pizzas" as used in Section 7(a) of the Agreement. LLFI argues that the Agreement only prohibits it from making substantially identical "pizzas" - not "crusts" - and that the term pizza is not ambiguous. (LLFI Mem. in Supp. of Mot. for Summ. J. at 21-23.) In response, FFGI argues that, in the frozen pizza business, because the crust "is pretty much why we exist," substantially identical crust specifications between the two products constitute a breach of the Agreement regardless of differences in pizza toppings. (FFGI Mem. in Opp'n to Defs. Mot. for Summ. J. at 29-30.) Upon review of the Agreement as a whole, I find that the term "pizzas" is unambiguous, and therefore should be given its ordinary meaning, i.e. the whole pizza - not just its crust. Although pizza crust may be an important aspect of the pizza as a whole, the Agreement clearly refers to "pizza specifications" -

not "pizza crust specifications." Therefore, LLFI is liable for breach of contract if it produced pizzas with specifications that were substantially identical to FFGI pizzas "existing specifications."

The parties next dispute the meaning of the term "existing specifications." LLFI argues that this phrase unambiguously refers to FFGI's specifications as of the date of the Agreement, August 23, 2002. (LLFI Mem. in Supp. of Mot. for Summ. J. at 24-25.) Thus, LLFI concludes that it is only prohibited from producing pizzas with substantially identical specifications to those listed in FFGI's "Quality and Control Specifications for Principal Products" attached as Exhibit B to the Agreement. FFGI, on the other hand, claims that this phrase is ambiguous because it could also mean the "existing specifications" at the time of the offending production. (FFGI Mem. in Opp'n to Defs. Mot. for Summ. J. at 29.) Both of these interpretations are reasonable. LLFI has not cited to any other contractual language supporting its interpretation, nor has LLFI identified any extrinsic evidence supporting its interpretation (much less any undisputed extrinsic evidence). As such, the meaning of "existing specifications" cannot be resolved on summary judgment. Therefore, LLFI's motion for summary judgment as to Count III is denied.

## C.  Count IV

In Count IV, FFGI alleges that Kraft was unjustly enriched by

using "FFGI's equipment line at [LLFI] to develop and to produce the DiGiorno Thin Crispy Crust Pizza, or the Pizza Crust, without having to pay for the use of the FFGI equipment line." Kraft argues that the undisputed evidence demonstrates that it paid, and continues to pay, LLFI for the use of its facility and equipment line on a per unit basis. (*See* Kraft Mem. in Supp. of Mot. for Summ. J. at 21.) Kraft also claims that, under the Agreement, LLFI is not required to pay FFGI for others' use of the line.

With regard to LLFI paying FFGI, the Agreement permitted LLFI to use the FFGI line for other customers subject to certain restrictions. According to Cokinos' testimony, the Agreement also provided for reduced pricing to FFGI based upon more frequent use of the equipment line, whether by FFGI or another customer. Thus, it is not necessarily undisputed that FFGI was not compensated based on other company's or companies' use of the line.

With regard to Kraft paying LLFI, Kraft relies on Section 3 of the Kraft Agreement, which governs pricing and payment, stating that Kraft "shall pay" LLFI "the prices set forth in Exhibit 3 for the services performed and the Product purchased[.]" Exhibit 3 to the Kraft Agreement identifies as pricing components: raw materials, packaging materials, and conversion cost. Conversion cost is defined to include the cost of "direct labor, utilities, overhead, storage, miscellaneous packaging supplies, and margin charges (all costs except Raw Materials Component and Packaging

Materials Component . . . to manufacture Product." FFGI responds that the section of the Kraft agreement relied on by Kraft does not support the proposition that Kraft paid to use "any equipment, much less FFGI's equipment." (FFGI Mem. in Opp'n to Defs. Mots. for Summ. J. at 30.) In its reply, Kraft argues that Kraft's payment to LLFI pursuant to the Kraft Agreement "was to cover *all* costs related to production, which necessarily includes equipment costs." (Kraft Reply in Supp. of Summ. J. at 14.) Section 3 of the Kraft Agreement, and Exhibits 3 and 5 thereto, however, do not expressly state that the costs identified therein necessarily encompass payment for Kraft's use of the FFGI line. And Kraft has not cited to any other evidence in the record to support its interpretation of the contract. I cannot determine from the evidence presented that Kraft paid, and continues to pay, LLFI to use FFGI's equipment.[23] Therefore, Kraft's motion for summary judgment as to Count IV is denied.

III.

---

[23]In addition, the Kraft Agreement states that it is effective as of January 1, 2004, and therefore post-dates the commencement of Kraft's relationship with LLFI, which began in August 2003. Thus, even if the Kraft Agreement expressly specified that Kraft's costs include use of FFGI's equipment line, it still fails to demonstrate payment therefor for approximately the first five months of Kraft's relationship with LLFI. Moreover, the Kraft Agreement does not necessarily support Kraft's assertion that it continues to pay LLFI for use of FFGI's equipment because it indicates in Section 2.a. that the initial term ended on December 31, 2006; and, although the agreement provides for renewal, the materials cited by Kraft do not indicate whether it was renewed and, if so, until when.

For the foregoing reasons, defendants' motion for leave to incorporate motion to bar into pending motion to strike is granted, and defendants' motion to bar is granted in part; defendants' motion to strike is otherwise denied. Plaintiff's motion to strike is denied. LLFI's motion for summary judgment is denied; and Kraft's motion for summary judgment is denied.

**ENTER ORDER:**

_Elaine E. Bucklo_
**Elaine E. Bucklo**
United States District Judge

Dated: April 3, 2008